Raymond J. TORRES, Franklin J. Utz, and Gerald F. Schmit, Plaintiffs–Appellees,

v.

WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL SERVICES, et al., Defendants–Appellants.

No. 86–2161.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 9, 1986.

Decided Jan. 29, 1988.

Reheard En Banc May 26, 1988.

Decided Oct. 17, 1988.

Diane M. Nicks, Wisconsin Dept. of Justice, Madison, Wis., for defendants-appellants.

Dale L. English, Colwin Fortune, Colwin Pomeroy & English, Fond du Lac, Wis., for plaintiffs-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Defendant Nona J. Switala is the superintendent of defendant Taycheedah Correctional Institution (TCI), the only women's maximum security prison in Wisconsin. TCI is operated by the Wisconsin Department of Health and Social Services (DHSS), also a defendant here. Ms. Switala, an experienced prison administrator, determined that the rehabilitation of TCI's inmates would be enhanced by employing only female correctional officers in TCI's living units. The plaintiffs Raymond Torres, Franklin Utz, and Gerald Schmit were reassigned to other positions at TCI, with no loss in pay, because of this plan. Unhappy with this reassignment, the plaintiffs brought this action alleging sex discrimination by the defendants in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e to 2000e-17. The defendants responded that sex was a bona fide occupational qualification (BFOQ), 42 U.S.C. § 2000e-2(e)(1), for the positions formerly held by the plaintiffs. The district court determined that the defendants had not established a valid BFOQ because the defendants had not offered "objective evidence, either from empirical studies or otherwise," proving that the BFOQ would further inmate rehabilitation, and because prison security and inmate privacy were not materially advanced by the plan. We reverse and remand.

I

Facts

TCI has three buildings for housing inmates. Each building has three residence floors, and the inmates live in single, double, or multiple occupancy rooms. The rooms are not cells with bars, but are more akin to college dormitory rooms. Each room has a solid door with a clear glass window at eye level that is approximately four inches by six inches. The rooms have one bed per inmate, a desk, chair, light, toilet, and wash basin. In two buildings, privacy curtains have been installed around the toilets. When an inmate is behind the curtain, only her feet are visible. At the time of trial, TCI had plans to install privacy curtains in the other residence building soon.

From 6 a.m. until 9 p.m., inmates may place "privacy cards" inside the door windows so that they can use the toilet or change their clothes without being observed. TCI's rules allow the privacy cards to be up for only ten minutes per day per inmate. In multiple inmate rooms, this means that the cards can be up permissibly for as much as thirty or forty minutes. However, the testimony offered at trial suggests that correctional officers are not able to keep careful track of the time that a privacy card has been in place, and that inmates sometimes leave their cards up for more than ten minutes per inmate. On one occasion, two inmates used their privacy card to facilitate an escape, and on another occasion an inmate beat up her roommate while the privacy card covered the window.

From 9 p.m. until 6 a.m., inmates may not place their privacy card on the inside of their window, but they may place their card outside the window all night long in order to prevent light from entering the room. Correctional officers then lift up the card for body counts and inspections. TCI's

rules require that the officers conduct a body count each day at 7:30 a.m., 12:30 p.m., 5:30 p.m., 9:30 p.m., and once each hour between 10 p.m. and 6 a.m. Inmates know this schedule. TCI provides appropriate sleepwear for the inmates but they are not required to wear it. The guards are required to see the inmates' skin or hair during nighttime body counts.

Each floor of the residence buildings has a shower room. Inmates must sign up with their floor officer before taking a shower, and they are required to wear some sort of clothing when walking to the shower room. Testimony at trial suggested that guards normally do not enter the shower rooms when occupied. The doors to the shower rooms are solid, although some contain windows that have been rendered opaque. The shower rooms have one to three shower stalls, one to three toilets, and some have one or more bathtubs. The showers and toilets have privacy curtains or privacy doors. Only one inmate may occupy the shower room at a time, except that roommates may enter together. TCI allows each inmate fifteen minutes in the shower room.

The Wisconsin Administrative Code allows prison officials to perform four types of inmate searches. Wis.Admin.Code § HSS 306.16 (1987). Correctional officers may perform pat searches at any time. During a pat search, inmates empty their pockets and the officer runs his or her hands over the inmates' entire body. § HSS 306.16(a). The custom at TCI is that only female guards perform pat searches. The second type of allowable search is the strip search. Strip searches must be authorized by a supervisor and performed in private by an officer of the same sex, except during emergencies. § HSS 306.16(b). The third type of search is the body cavity search. Body cavity searches are only performed by medical personnel in special circumstances. § HSS 306.16(c). The fourth permissible search is a body content search, such as urinalysis or blood analysis. § HSS 306.16(d). Under this regulation, body content searches are permitted only in extreme circumstances. In addition, correctional officers are expected to search occasionally inmates' rooms and the shower rooms when they are unoccupied.

Ms. Switala became superintendent of TCI in 1978. She previously had worked for three years as treatment director at TCI and for eight years as a probation and parole agent with the Wisconsin Division of Corrections. Ms. Switala, her superiors at the DHSS, and her personnel at TCI, soon began discussions regarding TCI's staffing needs. It ultimately was decided, principally by Ms. Switala, that certain positions at TCI should be staffed only by female correctional officers. It is clear from Ms. Switala's testimony at trial that the principal reason for this decision was her concern for inmate rehabilitation and security. TCI's administrators then advised all correctional officers in 1980 that a BFOQ program would be implemented gradually in the next two years.

TCI has three different ranks for its correctional officers. The lowest position is a correctional officer 1 (CO–1), followed by correctional officer 2 (CO–2) and correctional officer 3 (CO–3). The CO–3 in charge of a living unit is a "sergeant." The positions to be affected by the BFOQ plan were nineteen of the twenty-seven correctional officer positions in the living units, including all of the CO–3 posts in the living units. As a result of the plan, only three CO–3 positions at TCI would be open to men. The three plaintiffs, Mr. Torres, Mr. Utz, and Mr. Schmit, were all CO–3's prior to implementation of the BFOQ plan. Because of the limited number of available CO–3 positions, the three plaintiffs were required to accept CO–2 positions, although this demotion resulted in no loss of pay. The plaintiffs presently work under female CO–3's who have less seniority and experience.

## II

### The District Court Opinion

The district court first determined that the BFOQ is a narrow exception to Title VII's prohibition of discrimination in employment. The court noted that "adminis-

trative convenience is insufficient to justify a BFOQ exception," and that discrimination based on sex is permissible only " 'when the essence of the business operation would be undermined.' " *Torres v. Wisconsin Dep't of Health and Social Servs.*, 639 F.Supp. 271, 277 (E.D.Wis.1986) (quoting *Diaz v. Pan Am. World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). The burden of establishing a BFOQ is a "heavy one," according to the court, and is "justified only in rare, appropriate circumstances." *Id.* at 278.

The court then analyzed the BFOQ under each of the defendants' proposed justifications: security, rehabilitation, and inmate privacy. Regarding security, the court found that male correctional officers had filled all of the BFOQ positions from 1975 until 1982 "without any contention that TCI suffered from a lack of security." *Id.* Moreover, the court noted that TCI continued to allow inmates to use privacy cards even after the BFOQ program had been installed, thus rebutting the argument that the presence of male guards reduced observation of the inmates. Although the court acknowledged that staffing problems at TCI might have been reduced by the BFOQ, since all guards then could perform all tasks, the court found that this justification merely constituted administrative convenience and not a genuine justification for sex discrimination. Thus, since the defendants had not presented evidence of any decline in inmate escapes or violence as a result of the BFOQ, the court found "that defendants have failed to justify the Plan based on security reasons." *Id.* at 279.

The court next analyzed the BFOQ under the defendants' rehabilitation justification. The court acknowledged that the defendants had "presented various witnesses familiar with the field of corrections who testified in support of this theory." *Id.* at 280. However, the court said that the plaintiffs also had presented witnesses who testified that male guards can enhance rehabilitation by "normaliz[ing]" the prison environment. *Id.* at 280 & n. 9. Thus, the court determined that the defendants had offered only a *"theory* of rehabilitation as a justification for the BFOQ Plan. They offered no objective evidence, either from empirical studies or otherwise, displaying the validity of their theory." *Id.* at 280 (emphasis in original). Having concluded that the rehabilitation theory was unproven, the court refused to justify the BFOQ based on the theory.

The court concluded its analysis by reviewing the BFOQ under the justification of inmate privacy. The court ruled that inmates do have a constitutional right to be free from unwarranted privacy intrusions, but that this right necessarily was limited. *Id.* at 280–81. The court then determined that any intrusions of privacy occasioned by male guards were not unwarranted nor unreasonable because of other precautions taken by the prison administration. For example, the court noted that toilet facilities have privacy curtains, that correctional officers do not observe inmates while they are showering, and that guards do not see inmates unclothed except during an emergency or when the inmate voluntarily allows it to happen. Therefore, the court found that privacy concerns did not justify the defendants' BFOQ plan.

Because the defendants had overtly discriminated against the plaintiffs on account of their sex, and since, in its view, there was no valid BFOQ, the court found that the defendants had violated Title VII. However, the court did not find that the plaintiffs were entitled to monetary damages. The court determined that the plaintiffs' reassignment had not caused any reduction in salary or overtime hours, and that therefore the plaintiffs had not established any monetary damages. For that reason, the plaintiffs' only remedy was an order abolishing the BFOQ plan and reinstating the plaintiffs in their prior assignments.

### III

### Analysis

A. *Title VII and the BFOQ*

We begin by reiterating several basic propositions, long established in the precedent, that must guide our decision today. "Title VII prohibits employment discrimination, which is 'one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's

sharing in the "outer benefits" of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses.'" *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 (11th Cir.1982) (quoting *Culpepper v. Reynolds Metals Co.*, 421 F.2d 888, 891 (5th Cir.1970)); *see also Rowe v. General Motors Corp.*, 457 F.2d 348, 354 (5th Cir.1972). The statute forbids both overt discrimination and practices that are " 'fair in form, but discriminatory in operation.'" *Pullman–Standard v. Swint*, 456 U.S. 273, 276, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)).

This case involves overt sex discrimination. It presents one issue—whether the district court correctly determined that sex was not a BFOQ for correctional officer positions at TCI. Section 703(e) of Title VII only permits classifications based on sex "where ... sex ... is a bona fide occupational qualification *reasonably necessary* to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e)(1) (emphasis supplied). It is universally recognized that this exception to Title VII was "meant to be an extremely narrow exception to the general prohibition of discrimination...." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 55 L.Ed.2d 786 (1977); *see also Pime v. Loyola Univ.*, 803 F.2d 351, 356 (7th Cir.1986) (Posner, J., concurring). As the Supreme Court recognized in *Dothard*, this narrow exception "has been variously formulated." 433 U.S. at 333, 97 S.Ct. at 2729. " '[D]iscrimination based on sex is valid only when the *essence* of the business operation would be undermined by not hiring members of one sex exclusively.'" *Id.* (quoting *Diaz v. Pan Am. World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971) (emphasis in original)).[1] As an alternative formulation, noted the Supreme Court, it has been held that "an employer

could rely on the BFOQ exception only by proving 'that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.'" *Id.* (quoting *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir.1969)); *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544, 91 S.Ct. 496, 498, 27 L.Ed.2d 613 (1971).

It is also well established that a BFOQ may not be based on "stereotyped characterizations of the sexes." *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2729. "Myths and purely habitual assumptions about a woman's [or a man's] inability to perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified individuals, or for paying them less." *City of Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978). On the other hand, there are real as well as fictional differences between men and women. *Id.* For instance, the Supreme Court has never hesitated to recognize sex-based differences, particularly in cases involving physiology, marriage, childbirth, or sexuality. *See Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) ("[T]his Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances."); *id.* at 481, 101 S.Ct. at 1210–11 (Blackmun, J., concurring) ("The Constitution surely does not require a State to pretend that demonstrable differences between men and women do not really exist."). *See generally Parham v. Hughes*, 441 U.S. 347, 354, 99 S.Ct. 1742, 1747, 60 L.Ed.2d 269 (1979) (opinion of Stewart, J.) ("In cases where men and women are not similarly situated, however, and a statutory classification is realistically based upon the differences in their situations, this Court has upheld its validity.");

**1.** Under this formulation, the Fifth Circuit in *Diaz* rejected the contention that sex was a BFOQ for airline flight attendants because the airline's proposed justification—to provide a

"pleasing environment" for passengers—was merely tangential to the airline's primary objective of providing safe transportation.

*Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) ("[T]he different treatment of men and women ... reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service." (emphasis in original)). This same principle has been recognized in the Title VII area. *See, e.g., Backus v. Baptist Medical Center,* 510 F.Supp. 1191, 1195 (E.D.Ark.1981), *vacated because of mootness,* 671 F.2d 1100 (8th Cir.1982) (recognizing the need to have female registered nurses care for obstetrical patients); *see also* I A. Larson & L. Larson, *Employment Discrimination—Sex* § 14.30 (1987) ("[G]iving respect to deep-seated feelings of personal privacy involving one's own genital area is quite a different matter from catering to the desire of some male airline passengers to have ... an attractive stewardess.").

Nevertheless, while recognizing that sex-based differences may justify a limited number of distinctions between men and women, we must discipline our inquiry to ensure that our tolerance for such distinctions is not widened artificially by—as the district court aptly put it—our "own culturally induced proclivities." *Torres,* 639 F.Supp. at 278. Nor, of course, can we tolerate the same preconceptions or predilections on the part of employers. Rather, we must ask whether, given the reasonable objectives of the employer, the very womanhood or very manhood of the employee undermines his or her capacity to perform a job satisfactorily. *Dothard,* 433 U.S. at 336, 97 S.Ct. at 2730.

One of the most important means by which an appellate court disciplines its inquiry is by keeping in mind the appropriate standard of review. The district court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). In *Anderson v. City of Bessemer City,* the Court said that a finding is clearly erroneous when " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. at 1511. Of course, this deferential standard of review presumes that the district court has applied correct legal standards—decisions of law are reviewed *de novo.*

### B. *The "Business" of the Employer*

With the foregoing propositions reaffirmed, we turn to the case before us. In our view, the decision of the district court that the defendants' BFOQ plan cannot be justified by concerns for prison security or for the basic privacy rights of the inmates is correct in law and fact. Thus, we turn to the only remaining question: whether the district court properly rejected defendants' contention that the BFOQ was necessary to further their goal of inmate rehabilitation.

The validity of a BFOQ can only be ascertained when it is assessed in relationship to the business of the employer. Our first step, therefore, must be to come to an understanding of the employer's business —its mission and the methodologies necessary to fulfill that mission. In accomplishing this task, we cannot deal in generalities. *See Trans World Airlines v. Thurston,* 469 U.S. 111, 122, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985). Rather, we must focus on the "particular business" of the employer in which the protected employee worked. *Id.* Oftentimes, this task requires that a court recognize factors that make a particular operation of an employer unique or at least substantially different from other operations in the same general business or profession. *See Pime v. Loyola Univ.,* 803 F.2d 351, 353–54 (7th Cir. 1986) (upholding the maintenance of a Jesuit "presence" as "important to the successful operation of the University," when there was evidence that it was "significant

to the educational tradition and character of the institution that students be assured a degree of contact with teachers who have received the training and accepted the obligations which are essential to membership in the Society of Jesus").

Here, of course, the broadest description of the "business" of the defendants is to say that they are in the business of governance at the state level. This general description, standing alone, gives them no special license with respect to Title VII. In *Dothard v. Rawlinson,* 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977), the Supreme Court said that "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." A more precise definition of the "business" of the defendants is to recognize that they are in the business of administering a penal institution. Few tasks are more challenging. As the Supreme Court has explained:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable....

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Those who assume the responsibility of administering any prison must grapple with the "perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens." *Rhodes v.*

*Chapman,* 452 U.S. 337, 352, 101 S.Ct. 2392, 2402, 69 L.Ed.2d 59 (1981); *see also Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 2402, 60 L.Ed.2d 447 (1979). *See generally Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 127–29, 97 S.Ct. 2532, 2538–40, 53 L.Ed.2d 629 (1977). In fulfilling these responsibilities, prison administrators always have been expected to innovate and experiment. *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987) (prison administrators must be allowed "to adopt innovative solutions to the intractable problems of prison administration"). Unless prison administrators try new approaches, the "intractable problems" will remain and the lot of the incarcerated individual will not improve. Indeed, it probably will deteriorate.

This general description of the task of prison administrators is still too general to permit us to assess accurately the claims of the parties. In *Dothard,* the Supreme Court focused not on maximum security institutions as a generic class but rather on the environment then existing in Alabama's penitentiaries—"a peculiarly inhospitable one for human beings of whatever sex." 433 U.S. at 334, 97 S.Ct. at 2729. In conformity to the mandate of the Supreme Court in *Dothard,* we must therefore refine further our focus. The defendants here are charged with the administration of a distinct type of penal institution—a women's maximum security facility. As the district court and one of the plaintiffs' own witnesses quite candidly acknowledged,[2] the same historical and empirical evidence that might guide the administrator of a similar institution for males simply is not available with respect to this environment. Therefore, the administrators of TCI were obliged, to a greater degree than their counterparts in male institutions, to innovate in achieving one of the tasks mandated by the Wisconsin legislature—rehabilita-

2. Dr. David Kalinich, a professor of criminal justice at Michigan State University, testified that he was not aware of any research regarding male correctional officers in female prisons. Tr. 6 at 138, 142. When the defendants challenged Dr. Kalinich's qualifications as an expert because he lacked experience in dealing with female institutions, the district court responded that there was not enough research on the subject of female institutions "for us to be too chary about applying generalized expertise in this area." *Id.* at 143.

tion. The defendants' "business" explicitly included—by legislative mandate—the task of rehabilitation. *See* Wis.Admin.Code §§ HSS 303.01(3)(c), HSS 306.01 (1987). One of the plaintiffs' expert witnesses testified that this goal was not considered, in modern penological theory, a high priority or, by some, even a realistic goal. Tr. 6 at 160 (testimony of Dr. David Kalinich). Wisconsin has made a contrary decision and rehabilitation, no matter how elusive, must be attempted. Wisconsin's goal is clearly a reasonable course, *see Rhodes*, 452 U.S. at 352, 101 S.Ct. at 2402, and we must accept it as part of the "business" of the defendants.

### C. *Rehabilitation: The TCI Approach*

Ms. Switala, the superintendent of TCI, made a professional judgment that giving women prisoners a living environment free from the presence of males in a position of authority was necessary to foster the goal of rehabilitation. This decision was based on Ms. Switala's professional expertise and on her interviews and daily contact with female prisoners. Tr. 10 at 110–11. She also based her decision on the fact that a high percentage of female inmates has been physically and sexually abused by males. Indeed, she noted that sixty percent of TCI's inmates have been so abused. Tr. 9 at 39.

### 1.

There can be no question that the proposed BFOQ is directly related to the "essence" of the "business"—the rehabilitation of females incarcerated in a maximum security institution. *See Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728–29 (quoting *Diaz v. Pan Am. World Airways*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). As we already have noted, the Wisconsin legislature has mandated that rehabilitation is one of the objectives of that state's prison system. *See* Wis.Admin.Code §§ HSS 303.-01(3)(c), HSS 306.01 (1987). Therefore, we stress that this is not a case where the interest of the plaintiffs in their continued employment simply conflicts with the basic privacy rights of the inmates. Here, the interest of the plaintiffs conflicts with the task of the administrators to rehabilitate the inmates for whom they are responsible. *Forts v. Ward*, 621 F.2d 1210 (2d Cir.1980), involved a female penitentiary. However, in that case, the suit was brought by prisoners against prison administrators. The prisoners sought to enjoin the administrators from assigning male guards to duties in the housing units of the prison. *Forts* therefore involved a straightforward conflict between the prisoner's right to privacy and the guards' rights, secured by Title VII, to employment security. Rehabilitation was not an issue in the case; the administrators made no claim that the presence of male personnel interfered with the performance of their duty. By contrast, this case involves just such a claim. Consequently, we are not dealing here with a mere matter of "consumer preference." *See Fernandez v. Wynn Oil Co.*, 653 F.2d 1273 (9th Cir.1981); *Diaz v. Pan Am. World Airways*, 442 F.2d 385, 389 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). *See generally* Schlei & Grossman, *Employment Discrimination Law* 341 (2d ed. 1983). The issue here is not what the prisoners want or believe is beneficial or appropriate. Rather, the issue is whether the state, charged with the responsibility of rehabilitation—a responsibility not only to the inmate but to the public—may pursue that goal in the manner at issue here.

### 2.

The more difficult question is whether the proposed BFOQ was "reasonably necessary" to furthering the objective of rehabilitation. The defendants can establish that the BFOQ was reasonably necessary only if they "had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all [men] would be unable to perform safely and efficiently the duties of the job involved." *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2729 (quoting *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir.1969)).

The district court determined that the defendants had not met this hurdle because "[t]hey offered no objective evidence, either from empirical studies or otherwise, displaying the validity of their theory." *Torres,* 639 F.Supp. at 280. We respectfully differ with our colleague in the district court as to the legal appropriateness of this standard. Certainly, there is no general requirement that the necessity of a BFOQ be established by this type of evidence. In *Dothard,* the Supreme Court determined that Alabama prison officials were justified in removing female guards from the state's "peculiarly inhospitable" penitentiaries. 433 U.S. at 334, 97 S.Ct. at 2729. The Court said that "[t]here is a basis in fact for expecting that sex offenders who have criminally assaulted women in the past would be moved to do so again if access to women were established within the prison." *Id.* at 335, 97 S.Ct. at 2730. The Court also said that there would "be a real risk that other inmates, deprived of a normal heterosexual environment, would assault women guards because they were women." *Id.* (footnote omitted). These appraisals were not based on objective, empirical evidence, but instead on a common-sense understanding of penal conditions, and, implicitly, on a limited degree of judicial deference to prison administrators.[3] As noted earlier, in *Pime v. Loyola University,* 803 F.2d 351 (7th Cir.1986), this court held that a Jesuit university could discriminate permissibly in favor of Jesuit instructors even though it had "not been shown that Jesuit training is a superior academic qualification, applying objective criteria, to teach the particular courses." *Id.* at 354. Similarly, in *Chambers v. Omaha Girls Club,* 834 F.2d 697 (8th Cir.1987), the Eighth Circuit held that a BFOQ need not always be supported by objective evidence. The Omaha Girls Club had discharged an unmarried pregnant staff member. The Club expected its staff members "to act as role models for the girls, with the intent that the girls will seek to emulate their behavior." *Id.* at 699. The court concluded that the Club's "role model rule" was justified by business necessity even though the plaintiff contended that "the role model rule is based only on speculation by the Club and has not been validated by any studies showing that it prevents pregnancy among the Club's members." *Id.* at 702. The court said:

> Although validation studies can be helpful in evaluating such questions, they are not required to maintain a successful business necessity defense. Indeed, we are uncertain whether the role model rule by its nature is suited to validation by an empirical study. Consequently, the court's conclusion in *Hawkins [v. Anheuser–Busch, Inc.,* 697 F.2d 810 (8th Cir.1983)] is apt in this case: "We cannot say ... that validation studies are always required and we are not willing to hold under the facts of this case that such evidence was required here."

*Id.* (footnote and citations omitted). Certainly, it is hardly a "[m]yth or purely habitual assumption," *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978), that the presence of unrelated males in living spaces where intimate bodily functions take place is a cause of stress to females. *See, e.g., EEOC v. Mercy Health Center,* 29 FEP 159, 163 (W.D.Okla.1982) [available on WESTLAW, 1982 WL 3108] (employment of male nurses in labor and delivery area would cause medically undesired tension); *Backus v. Baptist Medical Center,* 510 F.Supp. 1191, 1194 (E.D.Ark. 1981) (same); *Norwood v. Dale Maintenance System,* 590 F.Supp. 1410, 1422–23 (N.D.Ill.1984) (stress when attendant in office washroom is of opposite sex).

There is, it would seem, a substantial question as to whether the sort of problem

---

**3.** As in *Dothard,* the Court in *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), suggested that an employer need not always validate a BFOQ with objective, empirical studies. The Court said that the defendant airline did not need "to establish the risk of an airline accident 'to a certainty....' "

*Id.* at 419, 105 S.Ct. at 2754 (quoting *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 238 (5th Cir.1976)). So long as the airline's "argument has a *credible basis in the record,*" the jury could permissibly "defer in a close case to the airline's judgment." *Id.* 472 U.S. at 420, 105 S.Ct. at 2754 (emphasis supplied).

that the defendants' BFOQ plan was designed to resolve ever "is suited to validation by an empirical study." *Chambers*, 834 F.2d at 702. We need not resolve this matter definitively here.[4] In this case, there was general agreement among the parties and the district court that such material simply did not exist. One of the plaintiffs' own witnesses, Dr. David Kalinich, testified that there is little scholarship in the area of rehabilitation of the female felon. Tr. 6 at 138, 142. The plaintiffs emphasized this point by failing to introduce any witness with substantial experience or who had done scholarly work in the field of rehabilitation within female institutions. The plaintiffs' case was, to a very great extent, based on experts who had experience in male, not female, institutions. Indeed, the district judge, in accepting the credentials of Dr. Kalinich despite his lack of background in female institutions, specifically noted that comparable information about female institutions—and comparable experts—simply were not available. Tr. 6 at 143.

■ We believe, therefore, that the defendants were required to meet an unrealistic, and therefore unfair, burden when they were required to produce "objective evidence, either from empirical studies or otherwise, displaying the validity of their theory." *Torres*, 639 F.Supp. at 280. Given the nature of their "business"—administering a prison for female felons—the defendants, of necessity, had to innovate. Therefore, their efforts ought to be evaluated on the basis of the totality of the circumstances as contained in the entire record. In the Title VII context, the decision of penal administrators need not be given as much deference as accorded their decisions in constitutional cases. *Whitley v. Albers*, 475 U.S. 312, 321–22, 106 S.Ct.

1078, 1085–86, 89 L.Ed.2d 251 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 351–52, 101 S.Ct. 2392, 2401–02, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). However, their judgments still are entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience. The fact that the program is considered a reasonable approach by other professional penologists also is a factor to be given significant consideration. In an area where the questions are so many and the answers so few, the range of reasonable options must necessarily be more extensive. Certainly, the court ought not require unanimity of opinion and ought not to substitute completely its own judgment for that of the administration.[5]

### Conclusion

Because the district court resolved the issue before it on the ground that there was a lack of "objective evidence, either from empirical studies or otherwise," 639 F.Supp. at 280, it had no occasion to evaluate the entire record, according the decision of the administrator the appropriate weight. Accordingly, we believe that this matter ought to be remanded to the district court for further consideration. After the parties have had an opportunity to submit additional evidence, the court may redetermine the issue in accordance with the standard set forth in this opinion.

Finally, we emphasize that it would be a mistake to read our decision today as a signal that we are willing to allow employers to elude Title VII's requirements simply by arguing that they were "innovating." Rare is the employment situation in which an employer could argue that gender-based distinctions are a "reasonably

---

4. We are aware that the district court noted that Ms. Switala testified that the recidivism rate of 8 to 12 percent had not diminished during the BFOQ program. We do not believe that this factor taken alone is of any great relevance. First of all, the plaintiffs made no showing that such data, representing a relatively short time frame, is significant. Second, rehabilitation involves more than avoiding recidivism. It involves enhancing the individual's potential for

personal achievement. This factor is not easily subject to empirical study.

5. The district judge toured the prison during trial. Whatever the benefit of such an inspection with respect to matters of privacy and security, such an exercise is not relevant in determining the legitimacy of the defendants' rehabilitation program.

necessary" approach to innovation in one's business. We hold only that, given the very special responsibilities of these defendants and the obvious lack of guideposts for them to follow, it was error to require that they adopt only a course that was subject to objective validation. Accordingly, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion. Circuit Rule 36 shall not apply.

REVERSED AND REMANDED.

CUDAHY, Circuit Judge, with whom Circuit Judges CUMMINGS and EASTERBROOK join, dissenting:

In dissent, I would rely primarily on my opinion for the panel that originally heard this appeal, *Torres v. Wisconsin Department*, 838 F.2d 944 (7th Cir.1988). After parsing the district court's opinion to find errors I think more fanciful than compelling, the majority has sent this matter back. The district court may take additional evidence and then apply a new standard, the outlines of which are quite indistinct.

As a primary point, I share Judge Easterbrook's view, contained in his persuasive dissenting opinion, that the *employer* must establish the necessity of a BFOQ in order to avoid Title VII's strictures against employment discrimination. For this case that rule means that the burden of bridging the yawning gaps in our understanding of rehabilitation falls on the state, not the plaintiffs.

To meet its burden here, the state has relied on what could be characterized as a "feminist" theory of rehabilitation. It is argued that men are at the root of many of these female inmates' difficulties in social adjustment. The presence of men allegedly creates tension and stress in the living areas and men must therefore give up their jobs in those areas. This theory, propounded by the prison warden and supported by the testimony of two other witnesses, is fine in the abstract. It is logically coherent and its recognition of the problems men can cause women in our society is certainly praiseworthy. But the district judge found that the state's support for this theory, as applied to the rehabilitation of female prison inmates, was woefully inadequate to meet the demanding BFOQ standard. Under *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), to justify discriminatory employment practices employers, public no less than private, must show that these practices are "necessary to safe and efficient job performance." *Id.* at 332 n. 14, 97 S.Ct. at 2728 n. 14. The record here contained, in opposition to the state's position, testimony from plaintiffs' expert Dr. Frederick Fosdale, who opined that the presence of males in the living quarters was valuable to inmates' eventual ability to adjust to the outside world. Tr. 6 at 14–15. Dr. David Kalinich, another expert for the plaintiffs, testified that TCI's BFOQ plan had not enhanced any rehabilitative efforts. Tr. 7 at 6. The plaintiffs also called Robert E. Ellsworth, a former Director of Wisconsin's Bureau of Adult Institutions, who testified that employing staff of both genders can have a beneficial effect on the treatment of inmates, provided privacy concerns are met. Tr. 6 at 64. The record also contained one meager bit of quantitative evidence: Superintendent Switala's concession that TCI's recidivism rate had not declined since the gender-based restrictions had been imposed. Tr. 10 at 177–82; *see* 639 F.Supp. 271, 280 (E.D.Wis.1986). Concededly, the period over which potential improvements were measured was short and trends in recidivism rates may not reflect all of an institution's improvements in "enhancing the individual's potential for personal achievement." Maj. op. at 1532 n. 4. But the burden here, a heavy one, was on the state to show that gender discrimination was necessary, not on the guards to show that gender neutrality was harmless.

Also significant, in my view, is what the record did not contain. If the presence of men in the living units was as stressful and disruptive as the state claims, one would think that specific, concrete evidence of negative inmate reactions would have been available. There was none of this. The only evidence presented in this vein was Superintendent Switala's general description of complaints received from inmates.

Tr. 9 at 83–85. This gaping void in the evidence is perhaps what Chief Judge Warren had in mind when he commented upon the state's lack of "objective evidence."

The majority finds conclusive evidence of legal error in the district court's statement that the defendants "offered no objective evidence, either from empirical studies or otherwise" in support of their rehabilitation theory. 639 F.Supp. at 280. According to the majority, this statement demonstrates that Judge Warren's legal standard was "unrealistic" and "unfair." Maj. op at 1532. I think the majority makes far too much of an isolated comment in a detailed and thoughtful opinion. Perhaps the district judge should have stressed his recognition that expert testimony is competent in this kind of case. I do not believe that Judge Warren's language, which is juxtaposed with a summary of the contradictory expert testimony of the defendants' and plaintiffs' experts, even remotely establishes that the district judge carried the skepticism required in assessments of BFOQ claims to an extreme.

The majority claims that the plaintiffs' evidence does not prove to its satisfaction that Superintendent Switala's decision to establish the BFOQ was not "the product of a reasoned decision-making process, based on available information and experience." Maj. op. at 1532. This approach to formulating a standard cannot, of course, be reconciled with *Dothard*. Further, the majority's assumption that there are decisive differences in the rehabilitation of men and women convicts runs totally counter to Title VII's mandate to view such assumptions with suspicion. Although it eschews any bold statement, the majority opinion amounts to a prison exception to the generally applicable BFOQ standard. We are told that prison officials, particularly prison officials who answer to legislatures that believe, at least in theory, in attempting to rehabilitate inmates, face "intractable problems" which they must address under conditions of radical uncertainty. To have any hope of accomplishing their daunting task these prison administrators must have the latitude to innovate in ways that violate otherwise applicable strictures against employment discrimination. Courts must therefore recognize this experimental license as a necessary element of prison administration in BFOQ cases.

To confine this special treatment to prisons, however, we would have to rely more on edict than on principle. Society asks many public institutions to attack seemingly intractable problems in areas beset by uncertainty. The jobs of maintaining law and order and providing adequate health care and effective education, particularly in our poorest neighborhoods, come immediately to mind. In constitutional cases, one source of the majority's special deference to prison administrators, the Supreme Court has recognized that the special demands placed on public school administrators, like the demands placed on prison administrators, necessitate special leeway. *See, e.g., Hazelwood School Dist. v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). I doubt that the majority would be prepared to permit school administrators to adopt BFOQs involving race, gender, religion or age based solely on a showing that the discriminatory measures were "innovative" and adopted in good faith in the face of intractable educational problems and pedagogic uncertainty. I do not doubt, however, that reversal in this case has far more to do with the majority's disagreement with Judge Warren's weighing of the evidence than with any particularly compelling need for prison administrators to innovate in ways that violate strictures against employment discrimination.

Even with its newly crafted experimental license doctrine, the majority's determination to reverse necessitates some energetic massaging of the plaintiffs' evidence. Apart from the recidivism numbers, which the majority feels safe in disregarding due to the short time period they cover and the presumed shortcomings of recidivism as a measure of rehabilitation, there is the testimony of Fosdale and Kalinich. The majority finds this evidence wanting because Kalinich's work had primarily involved male prisons—though he also had done consult-

ing and administrative work involving female prisons, *see* tr. 6 at 140–41—and because both expressed skepticism about the prospects for rehabilitation in general. Ordinarily, we leave assessments of the persuasiveness of expert testimony to district courts. *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed. 2d 518 (1985), requires us to apply the deferential clearly erroneous standard of review to district court factual determinations—even to factual determinations based on physical or documentary evidence, which would appear to present a weaker case for deference than the assessment of testimony at issue here. *Id.* at 573–76, 105 S.Ct. at 1511–13. Moreover, this circuit has long held that assessments of expert testimony are no different from other factual determinations in this respect. *See, e.g., George R. Churchill Co. v. American Buff Co.,* 365 F.2d 129, 130 (7th Cir.1966). I would have thought that such matters as determining the boundaries and transferability of Kalinich's expertise (a point on which the district judge expressly ruled, *see* tr. 6 at 143) and deciding how Fosdale's and Kalinich's general doubts about the possibilities of rehabilitation affected their credibility on the question at hand were part of the fact-finder's function.

Finally, the majority suggests that a "common-sense understanding of penal conditions," as well as deference to prison administrators, supports its rejection of the trial judge's evaluation of the evidence. Maj. op. at 1531. The conventional view is that common sense in a particular field, though perhaps partly innate, develops through exposure to events and experiences. Ordinarily, we assume that the comparative advantage on matters of common sense rests with district judges. In this particular instance, the rule of thumb seems especially apt. Judge Warren has served as district attorney of one of Wisconsin's larger urban counties and as Attorney General of the state for a number of years. He has certainly had considerable exposure to penological practice and to penological theory. His experience has endowed him with an uncommon amount of common sense. I do not believe it is necessary to seek new evidence and pursue a new analysis of the matters he has ably addressed.

I therefore respectfully dissent.

EASTERBROOK, Circuit Judge, dissenting.

States should have latitude to experiment in their handling of prisoners. No one has found a satisfactory way to deal with offenders, and only an exceptionally strong reason should induce courts to interfere with the search. Courts should accept reasonable judgments by state officials in the ordinary course of prison management. The security and privacy concerns of prison life should cause judges to doubt that making prisons more like civilian life is wise. Female guards may make Taycheedah both a more humane place for its inmates and a more secure place in which to confine them. The judges in the majority deploy these contentions in reversing the district court.

If this were a suit directly under the fourteenth amendment, the state would receive the benefit of these observations. E.g., *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2259–62, 96 L.Ed.2d 64 (1987); *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987). It is not, so the state does not. This suit invokes Title VII of the Civil Rights Act of 1964. Exercising its power under § 5 of the fourteenth amendment, Congress altered the usual burdens. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); cf. *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). The employer in a Title VII suit must show that its use of gender as a ground of decision is not only reasonably related to legitimate objectives (the constitutional inquiry) but also "necessary". *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The employer's burden is less onerous when the plaintiff protests the disparate consequences of a policy that is neutral with respect to sex, see *Watson v. Ft. Worth Bank & Trust,* —— U.S. ——, 108 S.Ct. 2777, 2787–91, 101 L.Ed.2d 827 (1988) (plurality opinion), but Wisconsin uses gender as an explicit ground of decision and so must satisfy the

most exacting standard. The statute grants rights to employees, not to employers. The district court held a trial and concluded that the state's evidence did not satisfy its burden.

The allocation of the burden makes all the difference when uncertainty predominates—a fair description of arguments pro and con about the operation of prisons. Do the privacy cards protect privacy at the expense of security? Surely yes, but equally surely the sacrifice is not great. Taycheedah retained its privacy cards even after banishing men from the corridors. No one knows the extent of the cards' effects, so we must accept the district court's view of the subject. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Women's prisons throughout the nation employ male guards; other women's prisons in Wisconsin do so; four other courts of appeals have held that unless prisons entail grave risks of violence to members of one sex only, as in *Dothard*, sex is not a bona fide occupational qualification for the position of prison guard, see *Harden v. Dayton Human Rehabilitation Center*, 779 F.2d 50 (6th Cir.1985), affirming 520 F.Supp. 769 (S.D.Ohio 1981); *Hardin v. Stynchcomb*, 691 F.2d 1364 (11th Cir.1982); *Forts v. Ward*, 621 F.2d 1210 (2d Cir.1980); *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir.1980).

Do the male guards hinder rehabilitation of the female prisoners? Maybe, but the expert testimony in the case conflicts, which mirrors the conflict in society at large about rehabilitation. Some use this word to refer to restoring (or creating) a sense of normal social interactions, including respect for privacy. One expert testified along these lines that male guards hinder rehabilitation by reminding the prisoners of their past, often unhappy, encounters with men; another expert testified that male guards promote rehabilitation because their presence reflects a part of reality to which prisoners must be accustomed if they are to function normally after release. Who is right? When the burden is on the defendants, and the trier of fact has found the defendants' explanations shallow, an appellate court must accept that decision. We ought not take it as indisputable that women are different from men and use that premise to justify sex differences in employment. Congress thought otherwise; the district court found otherwise. Under the court's treatment of "necessity" a district judge may (perhaps is compelled to) accept an employer's bare opinion that segregation by sex is helpful. Rarely are we so deferential even in litigation filed by prisoners directly under the Constitution, the source of the "deference" cases to which the court refers, see maj. op. at 1527–29. *Dothard* held that a level of violence (including sexual violence) exceptional for American prisons supplied a BFOQ; the majority today says that sex may be a BFOQ in every female prison (maybe every prison) in America.

There is another sense of rehabilitation: the ability of a prison to "cure" persons of their criminal habits, measured by the recidivism rate of the former inmates. The rate of crime falls with age, D.P. Farrington, *Age and Crime*, 7 Crime and Justice: An Annual Review of Research 189 (1986), and with the threat of punishment (deterrence), so any prison may "rehabilitate" its inmates by holding them longer. No solid evidence shows that the conditions at a prison affect recidivism. Neither educational programs nor confinement arrangements nor any other measurable attribute seems to reduce the rate of crime after release, holding other things (such as age and personal characteristics) constant. See Lee Sechrest, Susan O. White & Elizabeth D. Brown (eds.), **The Rehabilitation of Criminal Offenders: Problems and Prospects** (1979). "The view that 'nothing works' has ... become the conventional wisdom among most corrections practitioners and researchers." Peter W. Greenwood, *Controlling the Crime Rate through Imprisonment*, **Crime and Public Policy** 251, 253 (James Q. Wilson ed. 1983). The evidence in this record suggests that none of the changes in Taycheedah's operation affects the recidivism rate of its inmates. 639 F.Supp. 271, 280 (E.D.Wis. 1986).

The court concludes, maj. op. at 1530–32, that the district judge erred in requiring "objective" (that is, empirical) evidence to support any defense of bona fide occupational qualifications. If the district judge had used such an inflexible standard, he would have been in error. Digital computers are not the only source of facts. Employers often must act on widely held beliefs even if data remain to be collected. When there are no data, when the impressions and judgments of the witnesses conflict—witnesses for both sides were experienced in studying or managing prisons—the district court is entitled to credit one side's approach over the other's. The district judge did no more than that. He simply pointed to the lack of one kind of evidence as additional support for his conclusion. We review judgments, not opinions; an isolated sentence in a thoughtful opinion is not a sufficient basis on which to reverse a judgment.

The court's opinion masks a deeper question. Why does the need to employ female guards to promote rehabilitation establish the "necessity" of doing so? It cannot be that whenever the employer gets *any* benefit, however small, from using gender as a ground of decision, it is therefore "necessary" to use this criterion. Rehabilitation as a justification for confinement has all but vanished from American penology. The women's prison movement adopted in the last century and abandoned in this one a rehabilitative model of confinement. Nicole Hahn Rafter, *Prisons for Women, 1790–1980*, 5 Crime and Justice: An Annual Review of Research 129, 146–66 (1983). Congress jettisoned the rehabilitative justification for imprisonment when adopting the current criminal code in 1984. The arguments presented by Taycheedah's administrators reflect some persons' attitudes, but they are minority views among legislators and social scientists. To say, as the court does, maj. op. at 1530, that because Wisconsin believes in trying to rehabilitate prisoners, then "rehabilitation, no matter how elusive, must be attempted", is to assign no weight to the interests protected by Title VII. No state may define a trivial— or impossible—objective that requires the use of gender for its achievement and then invoke its objective as justification for the discrimination. If a state wants to pursue the impossible dream, it may not do so at the expense of race or sex discrimination.

One way or another, the arguments offered by the majority are a plea for a special rule for prisons. My colleagues believe not that the state has demonstrated the necessity of hiring guards by sex, but that the state should have leeway to experiment in the operation of its prisons even though it has not so far established the need to run them in a particular way. Congress might come to this conclusion, but it did not do so in 1972, when it extended Title VII to the states. *Dothard* rejects any argument that states should be treated differently as employers. The Court said:

> ... [The prison officials] contend that the establishment of the minimum height and weight standards by statute requires that they be given greater deference than is typically given private employer-established job qualifications. The relevant legislative history of the 1972 amendments extending Title VII to the States as employers does not, however, support such a result. Instead, Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike.... Thus for both private and public employers, "[t]he touchstone is business necessity" ...; a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge.

*Dothard*, 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14. *Dothard* was about the qualifications of prison guards. We cannot distinguish a prison guard case on the ground that prison officials should have special latitude to experiment. So Wisconsin does not prevail by establishing that its decision is rationally related to legitimate penological considerations—the standard for the constitutionality of most state action that the majority applies to Taycheedah's policy. A rational basis does not carry the day when the statute demands a "bona fide occupational qualification." See *Western*

*Air Lines, Inc. v. Criswell,* 472 U.S. 400, 422–23, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985) (decided under the Age Discrimination in Employment Act, but construing the defense applicable to many anti-discrimination laws).

A jailer's lot is not a happy one. *David K. v. Lane,* 839 F.2d 1265, 1278–80 (7th Cir.1988) (concurring opinion); *Walker v. Rowe,* 791 F.2d 507 (7th Cir.1986). (Apologies to W.S. Gilbert.) If the prison takes sex into account in choosing and assigning guards, the rejected applicants will sue under Title VII. If the prison hires guards of both sexes, the prisoners will sue on the ground that being observed and searched by someone of the opposite sex invades privacy. Whether to tighten this vise is a legislative decision, and the statute now in force prefers the interests of guards (as employees) over the interests of prisoners. At all events, the panel's opinion shows that the use of male guards at Taycheedah does not violate the privacy interests of the prisoners, 838 F.2d at 951–53, if they have any that the state is bound to respect after *Hudson v. Palmer,* 468 U.S. 517, 524–30, 104 S.Ct. 3194, 3199–3200, 82 L.Ed.2d 393 (1984).

When judges in constitutional litigation defer to prison officials' decisions, this is not because they know the decisions to be right. It is a contradiction in terms to decide which are the best ideas about prison management and then "defer" to their proponents. Prison cases reflect not rhetorical manipulation but genuine deference, based on a lack of knowledge. Certainly judges lack it; often so does everyone else. When the plaintiff bears the burden of persuasion, ignorance, combined with the judiciary's professional skepticism, implies leaving well enough alone. Uncertainty is not a good reason to remake prisons. They don't need reform; things are bad enough as they are. When information does not permit confident separation of right from wrong, courts cannot mark the "better" path. Only someone with the *answer,* and not just a point of view, may insist that everyone else fall into line. When Congress requires the state to justify its position, uncertainty cuts in favor of plaintiffs.

Judges cannot be skeptics in suits under the Constitution and confident that they (or prison officials) have the right answers in suits under Title VII. Even-handed skepticism implies that the party with the burden loses.