RONALD LEE GILMAN, Circuit Judge,
dissenting.
I disagree with the majority’s conclusion that being a female is a bona fide occupational qualification (BFOQ) for approxi- *762 raately 250 Correctional Officer (CO) and Residential Unit Officer (RUO) positions in prisons for women inmates managed by the Michigan Department of Corrections (MDOC). In reaching its conclusion, the majority repeatedly stresses the importance of giving “due regard to the professional judgment of the MDOC.” Although the judgments of prison officials are “entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience!,]” Torres v. Wis. Dep’t of Health & Soc. Servs., 859 F.2d 1523, 1532 (7th Cir.1988) (en banc), the factual findings of the district court following a bench trial are also entitled to substantial deference. Anderson v. City of Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
The district court made several key findings of fact that-1 believe have not been adequately considered by the majority. First, the district court concluded that standard practice in the corrections field is to allow the employment of males in female prisons, even though the male employees may be limited in the scope of the tasks that they are permitted to perform. Second, the court found that internal studies by the MDOC did not support the wholesale elimination of male COs and RUOs from the housing units in the female prisons. The studies recommended that various tasks be assigned on a gender-specific basis and that the number of female COs be increased in the female housing units, but they did not recommend a female BFOQ for these positions. Third, the court concluded that the professional concern over cross-gender supervision in Michigan prisons was essentially limited to that of Bill Martin, the then-current director of the MDOC who requested the BFOQ certification. Martin was not someone with extensive experience in prison policy and administration, nor did he consider the recommendations of the department’s internal studies or consult with other senior managers of the MDOC.
Despite these factual findings by the district court, the majority has accepted the conclusion that gender is a BFOQ in this case, a determination reached by Martin and “rubber-stamped” by the MDOC without consultation or study. Unlike the situation in Robino v. Iranon, 145 F.3d 1109 (9th Cir.1998), upon which the majority relies, the MDOC did not “conduct[ ] an extensive survey of post duties before determining which posts should be designated female-only.” Id. at 1111. The MDOC’s BFOQ determination, because it was not the “product of a reasoned decision-making process, based on available information and experience!,]” Torres, 859 F.2d at 1532, should be afforded less deference than we would, otherwise give the professional judgment of prison officials.
I also believe that the majority’s reliance on the Torres decision is unjustified. At issue in Torres was whether the district court erred in rejecting the prison officials’ contention that a female' BFOQ for correctional officer positions was necessary to further the goals of inmate rehabilitation, security, and privacy. 859 F.2d at 1526. The Seventh Circuit held that, with respect to the goal of inmate rehabilitation, the district court had erred in requiring the defendants to produce objective, empirical evidence of the need for a BFOQ, and remanded the case so that the district court could consider the totality of the circumstances. Id. at 1532. But with respect to the goals of security and privacy, the court affirmed the district court’s determination that the various methods the prison had adopted to address the privacy concerns of female inmates, such as the use of “privacy cards” and limiting male guards’ observation of unclothed female inmates, had not undermined prison secu *763 rity. Id. at 1526, 1528. It explained that “the decision of the district court that the defendants’ BFOQ plan cannot be justified by concerns for prison security or for the basic privacy rights of the inmates is correct in law and fact.” Id. at 1528 (emphasis added).
Here, however, the majority concludes that the female BFOQ is necessary to advance the goals of prison security and prisoner safety, even though the district court determined that changes implemented as a part of the settlement agreements referred to in the majority opinion — including the “knock and announce” policy, restricting pat-down searches of inmates by male staff, and limiting male officers’ views of areas where inmates dress, shower, and use the toilet — made a female BFOQ unnecessary. Thus, although Torres stands for the proposition that the reasoned judgment of prison officials should be given special consideration, it also supports the district court’s conclusion that a female BFOQ is not necessary or appropriate for the purposes of prison security and privacy rights.
Finally, I believe that the district court was correct when it called for the use of “a scalpel rather than a meat ax approach to staffing tasks in the female prisons.” Everson v. Mich. Dep’t of Corr., 222 F.Supp.2d 864, 896 (E.D.Mich.2002). A reasonable alternative to the complete exclusion of males from the CO and RUO positions is the assignment of sensitive tasks to female correctional officers. In concluding its opinion, the district court held that
there is no justification for a blanket ban on employment of male corrections officers in the female prisons of Michigan. The MDOC has the right to limit certain tasks in the female prisons to female corrections officers, particularly to ensure female inmates’ rights to privacy[,] bearing in mind at all times the security interest of the corrections officers.... There are tasks in the running of a female prison as has been explained above which should not be performed by male correction officers such as strip searches and body cavity searches. It should not be difficult to define these tasks and adjust CO and RUO duties in the housing units in the female prisons accordingly. Nothing in the decision here to deny the BFOQ’s requirement should be read to prohibit the MDOC officials from making gender specific task assignments. The vast majority of female prisons in the United States appear to manage their populations safely and efficiently and still comply with the requirements of equal employment opportunity laws. Nothing in the record here suggests the MDOC can not do the same thing.
Id. at 898-99. I fully agree with this assessment.
Other courts that have addressed this precise issue have reached the same conclusion. See, e.g., Forts v. Ward, 621 F.2d 1210, 1216-17 (2d Cir.1980) (affirming the portion of the district court’s decision that balanced the conflict between male guards’ employment rights and female inmates’ privacy rights by “carefully tailored adjustments to either facilities or work assignments[,]” and vacating that portion of the decision that categorically prohibited the assignment of male guards to nighttime shifts); Gunther v. Iowa State Men’s Reformatory, 612 F.2d 1079, 1086 (8th Cir.1980) (holding that in order for a male prison to show that the hiring of women for guard positions was unworkable, the prison “must also demonstrate that it could not reasonably rearrange job responsibilities in a way to minimize the clash between privacy interests of inmates and *764 the nondiscrimination principle of Title VII”).
Given that gender-sensitive task assignment is a preferred alternative to the wholesale exclusion of males from the positions in question, I believe that the majority has erred in holding that being a female is a BFOQ for those positions. The fact that the overwhelming weight of judicial authority agrees should make us all the more cautious in finding that a BFOQ exists in this case. Accordingly, I would AFFIRM the decision of the district court.