NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0177n.06

No. 20-3312

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHONDA K. MILLION, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Apr 07, 2021 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| WARREN COUNTY, OHIO, through the Warren | ) | UNITED STATES DISTRICT |
| County Board of Commissioners, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |

BEFORE: MERRITT, KETHLEDGE, and WHITE , Circuit Judges.

PER CURIAM. Plaintiff-Appellant Shonda Million appeals the grant of summary judgment to her employer in this action alleging claims for sex discrimination and retaliation under Title VII and Ohio state law. We affirm.

Million was a corrections officer for the Warren County Jail (the "Jail") from September 2006 to January 2016. The Jail required at least two female corrections officers to work every shift. As a result, female officers sometimes had to work forced, female-only overtime and received unequal priority compared with male coworkers when bidding for shifts. Million challenged this policy as discriminatory in several internal grievances, beginning in 2012, and a 2013 charge with the Equal Employment Opportunity Commission. From March 2014 to December 2015, the Jail disciplined her several times, audited her internet usage, initiated several sick-leave reviews, and revoked her position as a "field training officer." Believing these actions were taken in retaliation for her discrimination complaints and would continue, she submitted a

resignation letter in late December 2015 and worked her last day in early January 2016. She then filed this action alleging discrimination and retaliation. The district court granted the Jail's motion for summary judgment and dismissed Million's claims on the bases that the Jail established its "bona fide occupational qualification" (BFOQ) defense, and Million failed to show that she suffered a "materially adverse action." For the reasons that follow, we affirm both decisions.

## I. Factual Background.

### A. Background On The Warren County Jail.

Shonda Million began working as a corrections officer for the Warren County Jail on September 26, 2006 and worked her last day at the Jail on January 8, 2016. The Jail is operated by the Warren County Sheriff's Office. It houses minimum, medium, and maximum-security adult inmates of both sexes. It can hold 224 male inmates and 66 female inmates. Between September 2012 and August 2015, the Jail employed 17–23 female officers and roughly 33–35 male officers, not counting supervisors. The Jail has four male housing units (A-Pod, B-Pod, D-Pod, and F-Pod) and one female housing unit (C-Pod). C-Pod has two common areas separated by a glass control booth and, in total, contains roughly 30–35 cells.

At least two posts must be filled for each shift assignment in C-Pod: the "control-booth" and "rover" positions. The control-booth officer observes the common areas, aided by monitors, and may be either male or female. The rover patrols the pod, delivers meals and mail, monitors inmates when they are out of their cells, and performs a visual security check (a "round") of each cell every 59 minutes. Rovers patrol every part of a pod, including showers and bathrooms. Because male officers are not allowed to "observe female inmates disrobed" and may not enter C-Pod's shower and bathroom areas without first announcing their intent to do so, R. 32-8 PID 215, only females are permitted to work as rovers in C-Pod. Task assignments for a given shift (such as to the rover or control-booth tasks) rotate every day and are not separate job positions. These

rotating task assignments do not affect an officer's promotional opportunities, pay, benefits, or seniority.

### B. Warren County Jail's Two-Female Staffing Policy.

The Jail has three shifts—First Shift (midnight to 8:00 a.m.), Second Shift (8:00 a.m. to 4:00 p.m.), and Third Shift (4:00 p.m. to midnight). The Jail requires at least two female officers to work each shift. Shift placement does not affect an officer's pay, benefits, or responsibilities.

In an affidavit, Warren County Sheriff Larry Sims offered two reasons for the two-female policy. First, on every shift, the Jail requires one female officer to work as the C-Pod rover while another—who can work any task—must be available to process and "shower in" newly arrived female inmates. R. 32-8 PID 214. Sims explained that the female-rover policy promotes safety and security because when male officers must announce themselves before entering partitioned shower and toilet areas, their warnings may prevent "detection of . . . improper or unsafe conduct." R. 32-8 PID 215. The second female officer must be available to facilitate the "showering in" part of the booking process, where inmates are showered, escorted into a separate room, told to remove all clothing, and "subjected to an aggressive visual observation." R. 32-8 PID 214. Only officers of the same sex as the inmate may conduct this part of the booking process.

The second reason for the two-female policy is that the Jail requires two females to perform strip searches of female inmates. There are roughly 300 female-inmate strip searches each year. Ohio law requires all strip searches to be performed by someone of the same sex as the person being searched. Ohio R.C. § 2933.32(B)(6).[1] Accordingly, the Jail only allows same-sex strip searches. The Jail requires two officers to be present for all strip searches to improve its ability to

---

[1] This provision states: "A body cavity search or strip search shall be conducted by a person or persons who are of the same sex as the person who is being searched and the search shall be conducted in a manner and in a location that permits only the person or persons who are physically conducting the search and the person who is being searched to observe the search." Ohio R.C. § 2933.32(B)(6).

document each search and to keep inmates and officers safe. Sheriff Sims explained, "[t]here is a potential during every strip search that an inmate may become aggressive, disruptive, or combative or [that] a medical or other emergency might arise." R. 32-8 PID 215. The "presence of a second corrections officer allows for these occurrences, as well as [for] verification of what occurs during the search, better risk management, and protection of both the officer performing the search and the inmate being searched." R. 32-8 PID 215. Million does not dispute that it is necessary to have two same-sex officers present for every strip search.[2]

## C. The Two-Female Policy's Effect on Shift-Bidding and Female-Only Overtime.

The Jail's corrections officers work five days a week. Every six months, they submit bids to determine which shift they will work in an upcoming six-month period. The shift-bidding process is based on seniority. But to ensure that there are at least two female officers for each shift, the Jail limits the number of female officers who can bid for a particular shift. It does so by dividing the total number of officers across the three shifts.[3] As a result, a female officer with more seniority than a male officer may not be permitted to work her desired shift, while the more-junior male officer may be able to obtain the preferred shift.

---

[2] Although Sheriff Sims did not reference it in his affidavit, the Jail's two-female policy also appears to accord with an Ohio regulation governing the staffing of full service jails, which requires jails to maintain a written staffing plan that provides for a "sufficient number[]" of male and female staff "on-duty and available" to perform sensitive, gender-specific functions:

> There shall be a written, implemented staffing plan that includes jail personnel assignments, days of the week and hours of the day that assignments are covered and any deviations from the plan with respect to weekends, holidays or other atypical situations. . . . The plan shall include all posts and functions . . . [and] sufficient numbers of male and female jail staff on-duty and available to perform sensitive functions and procedures as necessary by inmate gender, and total number of employees required to fill identified posts and functions.

Ohio Admin. Code § 5120:1-8-17(D)(1).

[3] For instance, if there are 21 female officers employed with the Jail, that "dictates that all three shifts will have seven females." R. 34 PID 659. If there are 20 female officers, two shifts will have seven females, while the third would have six. R. 34 PID 664. From the record, it is unclear why exactly the Jail chose to evenly distribute its female employees across the three shifts. However, Million does not specifically challenge or address this particular policy, instead limiting her focus to the two-female requirement.

For example, on May 23, 2012, Million tried to bid for Shift Two (8:00 a.m. to 4:00 p.m.) but was told she was "unable to bid" that shift because she "was a female and [the Jail] had already filled the designated female" spots for that shift. R. 38-2 PID 811. Two male officers with less seniority than Million were able to obtain a spot working on Shift Two. Million testified that she was denied her preferred shift during "every" bidding period between her start-date in September 2006 and May 2012. R. 34 PID 279-81. After May 2012, however, she always received her requested shift.

The Jail also required female officers to work overtime when fewer than two female officers were available to work a shift. Sheriff Sims testified that "[m]ales can be, and are, similarly forced to work overtime," R. 32-8 PID 216, though the record does not disclose whether the Jail had a minimum-male policy similar to the two-female policy. During Million's time at the Jail, female-overtime amounted to less than 5% of the total overtime awarded. Million testified that she was forced to work overtime on several occasions. *See* R. 34 PID 392 ("I don't recall a period of time where we were not subject to being forced overtime as . . . an officer."). But aside from two days—May 2, 2013 and May 21, 2013—she could not recall any specific dates when she was forced to work overtime.[4]

Finally, because of the two-female policy, Million had requests for time off denied on at least two occasions. On September 26, 2014, the Jail denied her request for vacation time because it would "cause[] female only overtime." R. 38-2 PID 806. And on December 14, 2014, the Jail denied her request for time off because there was "[a]lready one female off . . . not enough working to give you the time." R. 38-2 PID 807.

---

[4] The record only provides overtime information for two years, 2012 and 2013. In 2012, Million was forced to work five hours of female-only overtime "caused by female minimum staffing requirements." R. 38-2 PID 824-25. In 2013, she was forced to work 18 hours of female-only overtime "due to female minimum staffing requirements." R. 38-2 PID 824-25.

### D.  Million Complains About Sex Discrimination.

On July 12, 2012, Million filed an internal grievance challenging the Jail's sex-based bidding policies as discriminatory.  On July 24, 2013, she filed a discrimination charge with the EEOC challenging the two-female policy and its effects on shift bidding and overtime.  On October 18, 2014, she filed an internal grievance after the Jail denied her request for time off because it would cause female-only overtime.

### E.  The Jail Disciplines Million.

From March 2014 to December 2015, the Jail disciplined, investigated, and took employment privileges away from Million.  She asserts that these actions were taken in retaliation for her discrimination complaints.  Her allegations can be grouped into four main events:

- On March 24, 2014, she received a "written reprimand" for missing work when she should have received only an informal "counseling" or verbal reprimand. This "over-discipline" led to a suspension (in February 2015) and loss of job privileges (in July 2015) that would not have happened had she received a lower form of discipline on March 24, 2014.

- On April 16, 2014, she received back-to-back reprimands for minor incidents, issued within a single hour of each other.  First, she was reprimanded for finishing a "round" as a rover one minute late.  Then, she received a written reprimand for excessive personal use of the internet, while her coworkers were never disciplined for similar internet use.[5]

- In November-December 2014, she was subjected to a "sick-leave review" and disciplinary hearing after her supervisor sent her home when she was sick at work, even though the Jail's rules clearly state that these types of absences may not trigger sick-leave reviews.

- In late December 2015, she was investigated for invoking FMLA sick leave, and the Jail sent two officers to her home as part of the investigation.

---

[5] There is ambiguity in the record regarding the timing of the two reprimands.  The report generated for the first reprimand has a "date" of April 11 written on it, but it was not "served" on Million—or signed by any Jail officials—until the morning of April 16, an hour before the second reprimand was "served."  R. 34 PID 635-36.

### 1. The March 2014 Written Reprimand.

On March 20, 2014, Million missed a shift that was set to start at midnight. She believed she had arranged for two coworkers to cover both halves of the shift, but she accidentally scheduled both to cover the second half. R. 34 PID 347, 349; *see also* R. 34 PID 632-33 (shift exchange forms with CO Westphal (number 788) and CO Hayes (number 795), both indicating coverage for 4:00 a.m. to 8:00 a.m. of Million's shift).

Due to a supervisor's error, Million's scheduling mistake did not appear on the shared digital schedule that she "routinely check[ed] before leaving for . . . days off." R. 38-2 PID 836; R. 34 PID 349. The schedule showed CO Hayes working the first half of the shift and CO Westphal working the second half. *See* R. 34 PID 634 (schedule listing Hayes (number 795) as working first half of shift and Westphal (number 788) working second half). Million checked the schedule before leaving for her day off on March 20.

Unaware of the scheduling mistake and thinking she was off, Million drank a beer on the night of March 20. *See* R. 38-2 PID 800 ("Since I was not scheduled to work, the thought of any problem resulting from having a beer never entered my mind."). When midnight came, her supervisor called to ask where she was, and both realized the scheduling mistake. Because the Jail barred employees from drinking within six hours of a shift, Million told her supervisor she could not come in because she had consumed alcohol that evening. On March 24, 2014, the Jail issued Million a "written reprimand." R. 34 PID 631.

Million complained that the Jail failed to follow its progressive-discipline policy—she argued that since she had no active absence violations on her record, she should have received a lower level of discipline. The Jail declined to reduce the discipline, explaining that it viewed the absence as a "serious offense" warranting a written reprimand. R. 32-3 PID 184; R. 34 PID 350, 372.

The Jail has a five-step progressive discipline system: (1) verbal reprimand; (2) written reprimand; (3) suspension without pay; (4) demotion; (5) termination. Verbal and written reprimands remain active for one year. The steps must be applied "in a progressive and uniform manner." R. 34 PID 586. For example, if an employee has received a verbal reprimand for an absence-related offense and commits the same type of offense while the first remains "active," she may next receive a written reprimand. R. 32-3 PID 184; R. 34 PID 348, 570, 586, 591. The Jail may deviate from its progressive-discipline policy to punish "serious offenses." R. 34 PID 586. It defines "serious offenses" as violations that "are very severe or possibly criminal," and which can "result in termination" for a first-time violation. R. 32-5 PID 203.

The Jail also uses forms of informal discipline, including "counseling," that do not rise to the level of progressive discipline. R. 32-5 PID 201-03, 205-06. Million testified that it was the Jail's normal practice to issue an informal "counseling" or verbal reprimand for an employee's first active absence-related infraction. R. 38-2 800; R. 34 PID 348. The Jail's Disciplinary Policy supports this. *See* R. 32-5 PID 201 ("Typically, counseling is the first form of corrective action issued to an employee when there is a minor behavior or performance issue . . . ."); R. 32-5 PID 203 (defining "minor offenses" to include "first or second violation(s)" of absence-related rules); R. 32-5 PID 205 (noting that when an employee "fails to properly call in work for any absence or failed to timely notify the proper party of the absence," counseling is the "preferred course of action" for a first-time offense, while "[r]epeated violations may result in progressive discipline").[6]

---

[6] The Disciplinary Policy is not entirely clear. On the next page, it states that a verbal reprimand is appropriate when an employee "fails to report for duty" but immediately shows up when called, and that a written reprimand is appropriate in that situation if the employee's supervisor cannot reach them. R. 32-5 PID 206. This creates factual ambiguity because the prior page states that counseling is the appropriate remedy when an employee fails to report an absence. At this stage, that ambiguity must be resolved in Million's favor.

When Million contested her March 24 written reprimand, she told the Jail that "[n]o counseling or verbal reprimand was received or is on my record," and that the written reprimand "puts me at Suspension level for the next [absence-related] violation." R. 38-2 PID 836-37. Indeed, the following year, on February 17, 2015, she received a one-day suspension for missing a shift in December 2014. The Jail suspended her because the March 24, 2014 written reprimand was still active. Then, in July 2015, the Jail denied Million's request to be renewed as a "field training officer" (FTO) because of the February suspension. R. 34 PID 360-65; R. 32-9 PID 219.[7]

### 2. The April 16, 2014 Reprimands.

On April 8, 2014, Million completed a "round" as a rover in 60 minutes, rather than 59 minutes. On April 16, at 5:38 a.m., the Jail "served" Million with a verbal reprimand for completing the round one minute late. R. 34 PID 635. Million testified that on a prior occasion, she had done the same thing and received no discipline. *See* R. 38-2 PID 800 ("On one occasion before April of 2014, I failed to complete a round in 59 minutes. I told Sgt. David Johnson about it. He did not issue any discipline."). The reprimand was for "unsatisfactory performance"; at the time, Million had no prior record for this sort of infraction. R. 34 PID 635.

An hour later, at 6:50 a.m., Million received a written reprimand for excessive personal use of the internet, also an "unsatisfactory performance" violation. *See* R. 34 PID 636 ("During a recent audit, it was discovered that you have been using the internet for personal gain. Your use has been excessive and covers an extended period of time."). She received a written

---

[7] FTOs train new corrections officers and receive a slightly higher wage. R. 34 PID 360. Million was an FTO for "five or six" years prior to 2015. R. 34 PID 363. She had recently received a glowing performance review. *See* R. 38-2 PID 839 (December 26, 2014 evaluation noting that Million was an "essential part of the . . . program over the past year"). The Jail has also denied a male officer's FTO renewal request because of a suspension. R. 32-9 PID 220.

reprimand because, as a result of the verbal reprimand she received an hour earlier,[8] she now had "[i]ntervening discipline" for a similar type of offense.  R. 34 PID 636; R. 32-3 PID 184.  Million "questioned" her superiors about the writeup but was told only that she had visited an "outdoor cabins site" somewhere in "Gatlinburg."  R. 34 PID 354-55.  Million testified that it was "common for employees in the jail to use the internet" for personal matters, and that she had seen several colleagues do so, including the supervisor who wrote her up.  R. 38-2 PID 800.[9]

### 3.  The October-December 2014 Sick-Leave Investigations.

From October to December 2014, the Jail conducted two separate administrative investigations into Million's use of sick leave, but neither led to discipline.  The Jail conducts sick-leave reviews whenever an employee has had five unscheduled absences within a twelve-month period, and for every unscheduled absence over the "next rolling calendar year."  R. 34 PID 330; R. 32-4 PID 190-91.  These reviews look for suspicious sick-leave patterns.

Million's first sick-leave review took place on October 27, 2014.  Nine days before, on October 18, Million had filed an internal grievance raising sex-discrimination claims.  The October 27 sick-leave review was triggered because Million called in sick on October 25 and 26, which brought her to five unscheduled absences in a twelve-month period.  The review discerned no pattern of sick-leave usage, however, because two of Million's five absences were justified with a doctor's note.  R. 34 PID 624.  She received no discipline.

The next sick-leave review took place on November 30, 2014.  Earlier that month, on November 5, 2014, the EEOC had issued a "determination" agreeing with Million that the Jail's

---

[8]  The record for the prior reprimand had a "date" of April 11 written in the top right corner, but was not served until April 16 at 5:38 a m.  R. 34 PID 635.

[9] Specifically, she testified: "I have observed Lt. Johnson on the internet doing non-work related tasks while on duty.  I have also observed Sgt. Denniston using the internet while at work to watch basketball videos.  I also recall receiving several emails with large distribution lists, including supervisors, from Lonnie Chapman, a male CO.  The emails were not work-related."  R. 38-2 PID 800.  Lt. Johnson wrote Million up for her internet use.  R. 34 PID 636.

gender-based staffing policies were discriminatory.  R. 38-2 PID 831-32.  This time, the review was triggered by Million's absences from November 22 through 24, after her supervisor, Sgt. Georgetta Sims, saw that she was sick at work and sent her home.  Under the Jail's Leave Policy, when a supervisor sends a sick employee home, that absence (and any consecutive days out) may not be "count[ed] against them when determining to initiate a review of sick leave use."  R. 32-4 PID 190-91.

Nevertheless, on November 30, Sgt. Denniston initiated a sick-leave review, found no pattern of sick-leave, and sent Million a memo so stating and noting that three of her now-six absences were justified by a doctor's note.  The next day, Sgt. Denniston wrote his superior, then-Major Barry Riley, requesting further follow-up action on Million.  He noted that of her six absences, only two had doctor's notes, even though his memo to Million the day before found three with doctor's notes.  The Jail then investigated Million's sick-leave usage and held a disciplinary hearing on December 29, 2014.

At the hearing, Million explained that Sgt. Sims sent her home and that her November 22 through 24 absences should not have initiated a sick-leave review.  The Jail eventually followed up with Sgt. Sims, confirmed that she sent Million home, found that Sims never told Sgt. Denniston she had done so, and concluded that the "sick leave review should not have been done by [Sgt.] Denniston."  R. 34 PID 629.  Million was not disciplined.

### 4. The December 2015 FMLA-Leave Investigation.

On November 11, 2015, Million had knee surgery and the Jail granted her FMLA leave. The Jail only grants FMLA leave if an employee submits proper paperwork, including a doctor's certification.  Before surgery, Million's surgeon, Dr. Paley, submitted a certification that Million should miss work until December 15, 2015.

On December 14, 2015, Dr. Paley signed a certification saying Million should remain out until December 20 and return on December 21, and the Jail extended Million's leave until December 21. When December 21 came, Million asked Dr. Paley to certify another leave extension. Due to a miscommunication with Dr. Paley's office assistant, Dr. Paley sent the Jail a form stating that Million should be placed on "light duty" starting December 21, until her appointment with Dr. Paley on December 24. R. 34 PID 450-52, 712-13.

On December 22, Million appeared at the Jail to sort out the paperwork situation. While she was at the office, her supervisor, Major Brett Richardson, told her that she was scheduled to work that night (December 23) from 4:00 a.m. to 8:00 a.m. Million replied that she planned to call in sick, and was trying to get the Jail the "proper paperwork faxed in" from her doctor extending her leave to December 24.[10] R. 34 PID 468-69.

At 9:00 p.m. that evening, Million called in sick for her 4:00 a.m. shift under the FMLA. Richardson called Million that night, but she did not answer. Chief Deputy Barry Riley then sent two officers to Million's home. The Jail's Leave Policy requires employees calling in sick to remain in their home (except to visit essential healthcare sites) and provides that there will be an "immediate investigation" if an employee is "not found" at his or her home. R. 32-4 PID 189. Riley said he sent the officers to "verify that [Million] was at home, as required by the sick leave policy, and due to the suspicion generated by her comments earlier that afternoon to her supervisor." R. 32-2 PID 184. He sent the officers sometime after 4:00 a.m. Million was in bed at home, did not hear the deputies when they knocked, and did not answer the door. Early the next

---

[10] Richardson paints a different picture. He says that when he told Million that she was scheduled for a shift, she "asked me what the consequences would be if she failed to show up for her shift, to which I responded that she would be considered AWOL. She said she was not planning to return until December 24, 2015 and that this throws 'a monkey wrench' in her life right now. Ms. Million did not mention any health issues to preclude her from working that night." R. 32-2 PID 179; R. 34 PID 716.

-12-

morning, Sgt. Lamb left a voicemail asking her to call Major Richardson before 8:00 a.m.  Million testified that she listened to the voicemail that morning, never called Richardson back, and "went back to sleep."  R. 34 PID 473.  Million reported for her next shift, set for midnight on December 24.  The Jail opened an investigation but found that Million had committed no violation because she "followed proper procedure calling off work on December 23."  R. 34 PID 719.  At some point after December 23, Million's doctor submitted the correct paperwork and the Jail retroactively granted FMLA leave until December 24.

Million testified that she felt "harassed" and "bullied" after this incident.  *See* R. 34 PID 477-78 ("They knew I wasn't coming in.  He knew that the paperwork wasn't right.  [HR] knew that the paperwork wasn't right and that I was trying to correct the problem that I wasn't coming in, and they still sent somebody to my house."); *id.* at 480-81 ("[T]hey actually had sent someone to my house knowing prior to that I was going to call in, I had told Major Richardson I would not be there at 4, that this still happened and they still did that, even with prior knowledge, [showed that the bullying] was never going to end for me there. . . .  [I] felt like I had a target on my back, . . . and I didn't feel like it was ending.").  On December 28, 2015, Million submitted a letter of resignation, and worked her last day on January 8, 2016.

## II.  Procedural History.

Million filed a pro se lawsuit in federal court on July 11, 2016.  She eventually retained counsel and filed an amended complaint, bringing three claims: (1) sex discrimination in violation of Title VII and Ohio R.C. § 4112.02(A); (2) retaliation under Ohio R.C. § 4112.02(I); and

(3) retaliation in violation of the FMLA.[11]   On February 15, 2018, Warren County moved for summary judgment on all claims.

Warren County expressly declined to invoke the bona fide occupational qualification (BFOQ) defense to Million's sex-discrimination claims.  In its opening brief, it argued that a BFOQ analysis was "unnecessary" because prisons may use facially discriminatory policies if they are reasonable and minimally burdensome.  R. 32 PID 148.  In a footnote, it added that it "believe[d] a [BFOQ] exists, but the issue of whether such exists, as a matter of law, is not material to the court's analysis."  R. 32 PID 148.  The brief otherwise never mentions the BFOQ defense.  In response, Million argued that Warren County could not establish any element of the BFOQ defense.  Warren County's reply reiterated that it was not asserting the BFOQ defense.  *See* R. 41 PID 856 ("In its motion for summary judgment, Warren County does not rely upon the existence of a BFOQ . . . to defend its actions nor ask this Court to assess the validity of any BFOQ.  To the contrary, Warren County argues that a BFOQ is unnecessary.").[12]

The district court granted summary judgment and dismissed all of Million's claims.  First, the court found that although Warren County did not raise the BFOQ defense in its opening brief, it raised it as an "alternative argument" in its reply and did not waive the defense, adding that since Million presented BFOQ arguments in her response brief, "the issue was fully joined by both

---

[11] Million has since abandoned her FMLA retaliation claim.  R. 38 PID 780 n.4.  For her retaliation claim, Million mistakenly cites Ohio R.C. § 4112.01—a definition section—but she clearly meant to cite § 4112.02(I), the relevant section for Ohio's anti-retaliation law.

[12] In two places in its reply brief, however, Warren County offered cursory statements suggesting that a BFOQ may exist.  First, in a footnote to its sentence declining to raise the BFOQ defense, it writes: "[e]ven if a BFOQ was found necessary, Ms. Million has not presented facts to dispute facts presented by Warren County that its minimum requirement of two female corrections officers on each shift and related gender-based job tasks are not only reasonable . . . but are also essential and reasonably necessary[.]"  R. 41 PID 856 n.3.  On another page it states: "[Million] fails to dispute that Warren County's requirement of two female corrections officers on each shift and related gender-based job tasks is not only reasonable, but also essential and reasonably necessary . . . .  Even if a BFOQ analysis were employed, Ms. Million has not presented facts to dispute that this burden of proof has not been met by Warren County."  R. 41 PID 862.

sides." R. 43 PID 896 n.2. It rejected Warren County's argument that a BFOQ was unnecessary but found that Warren County had established all three elements of the defense. Then the court granted summary judgment on Million's retaliation claim, finding that Million failed to show that she suffered any "materially adverse action," and therefore also could not show a causal connection between such an action and her protected activity. R. 43 PID 902-07.

## III. Standard of Review.

We review de novo a district court's order granting summary judgment. *Rudisill v. Ford Motor Co.*, 709 F.3d 595, 600 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). In determining whether the district court's grant of summary judgment was proper, "we must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV. Sex Discrimination.[13]

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff "may establish a claim for discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citation omitted). Facially discriminatory

---

[13] The Ohio Supreme Court has "determined that federal case law interpreting Title VII . . . is generally applicable to cases involving" Ohio's gender-discrimination statute. *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 731 (Ohio 2000); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004).

employment policies—like the Jail's two-female staffing policy—"constitute direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

When "'open and explicit use of gender is employed'" through a "facially discriminatory employment policy[,] . . . 'systematic discrimination is in effect admitted by the employer, and the case will turn on whether such overt disparate treatment is for some reason justified under Title VII.'" *Reed v. County of Casey*, 184 F.3d 597, 599 (6th Cir. 1999) (quoting *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 132 (3d Cir. 1996)). "Title VII permits overt discrimination" in two situations: (1) "if the disparate treatment is part of a legally permissible affirmative action program," or (2) it is "based on a bona fide occupation qualification ('BFOQ')." *Id.* Title VII's BFOQ defense allows an employer to consider sex in employment decisions "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e–2(e). This BFOQ exception is an affirmative defense. *Smith v. City of Jackson*, 544 U.S. 228, 233 n.3 (2005).

An employer asserting the BFOQ defense has the burden of proving three elements: (1) that there is a "basis in fact" for its belief that gender discrimination is "reasonably necessary"—not merely reasonable or convenient—to the normal operation of its business; (2) that the challenged job qualification "relate[s] to the essence" or "central mission" of the employer's business; and (3) that "no reasonable alternatives exist to discrimination on the basis of sex." *Everson v. Mich. Dep't of Corrs.*, 391 F.3d 737, 748-49 (6th Cir. 2004) (citations and internal quotation marks omitted)). The BFOQ defense is an "extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls,*

*Inc.*, 499 U.S. 187, 201 (1991) ("The BFOQ defense is written narrowly, and this Court has read it narrowly.").

Nonetheless, when a prison employer asserts a BFOQ defense, courts review the operative decisions with deference, provided those decisions result from a "reasoned decision-making process." *See Everson*, 391 F.3d at 750 ("[A]lthough the decisions of prison officials are not accorded as much deference in Title VII cases as they are in constitutional cases, 'their judgments still are entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience.'" (quoting *Torres v. Wis. Dep't of Health and Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988) (en banc))).[14]

Warren County has established all three elements of the BFOQ defense, and Million fails to create a genuine dispute as to any of them.

First, Warren County must prove that it had a "basis in fact" to believe that the two-female policy was "reasonably necessary" to the normal operation of its business. *Id.* at 748. It argues that the two-female policy was necessary for two reasons. First, the Jail requires at least one female officer to work as C-Pod rover each shift, while another must be available to process female inmates when they "shower in/out" upon arrival. Second, the Jail requires two female officers to work each shift to facilitate strip searches of female inmates. Because this latter justification clearly satisfies the first BFOQ element, we need not address the first justification. Warren County's strip-search justification has two premises, and Million does not dispute either of them: (1) under Ohio law, strip searches may only be performed (or witnessed) by someone of the same

---

[14] The district court applied a deferential review below. Million argues that the Jail is not entitled to deference because it failed to show that it engaged in a "reasoned decision-making process." Appellant Reply Br. at 2-3. But Million did not mention this argument in her opening appellate brief and instead first raised it in her reply brief. Accordingly, she has forfeited the argument and we do not address it here. *United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004).

sex as the person being searched, and therefore only female officers may perform strip searches on female inmates; and (2) the Jail requires two guards to perform all strip searches to promote safety and documentation. Million "does not dispute that two officers of the same sex were required to be present during strip searches." R. 38-1 PID 784. Thus, she fails to identify a dispute of fact as to this first element.

To establish the second BFOQ element, Warren County must prove that its two-female policy relates to the "essence, or to the central mission" of the Jail's business. *Everson*, 391 F.3d at 749. Million makes no arguments regarding this element and it is easily met. Sheriff Sims testified that the Jail's gender-based policies promote the Jail's "goals of security, safety, privacy, [and] risk management." R. 32-8 PID 216. The "goals of security, safety, [and] privacy . . . can justify gender-based assignments in correctional facilities." *Everson*, 391 F.3d at 750; *see also id.* at 753 (noting that the "essence" of a prison's business includes "security of the prison," "safety of inmates," and "privacy rights of inmates").

The third element imposes a burden on employers—not employees—to prove that there are no reasonable alternatives to the sex-based practice at issue. *See Everson*, 391 F.3d at 749; *Reed*, 184 F.3d at 600. In light of Million's concession that the Jail's strip-search justification is necessary, we find that this element has been met, also. Ohio requires full-service jails to maintain a written staffing plan that "include[s] all posts and functions, . . . [with] sufficient numbers of male and female jail staff *on-duty and available* to perform sensitive functions and procedures as necessary by inmate gender . . . ." Ohio Admin. Code § 5120:1-8-17(D)(1) (emphasis added). Million concedes that a minimum of two female officers must be present to perform strip searches. That concession is dispositive here. Million does not dispute that the Jail requires two guards to

perform the gender-sensitive task of strip searches, nor does she dispute that the Jail must comply with relevant state law.

Million proposes an alternative; she says that the Jail could jettison its two-female requirement and, in situations where fewer than two female guards are present, delay strip searches until a second female guard arrives. But this approach would run afoul of § 5120:1-8-17(D)(1)'s mandate that jails maintain staffing plans with a sufficient number of female guards "*on-duty and available*" to perform sensitive gender-tasks. Accordingly, Million's suggestion is not a "reasonable alternative."

Therefore, we agree with the district court that the BFOQ defense applies to Million's sex-discrimination claim and affirm the dismissal of that claim.

## V. Retaliation.

Million challenges the district court's denial of her retaliation claim. For substantially the same reasons stated by the district court, we affirm.

To prevail on this claim, Million must show, among other things, that she suffered a "materially adverse" action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). Adverse actions include instances where an employer disciplines an employee more harshly than similarly situated co-workers. *See id.* at 732. To prove that type of adverse action, an employee must present objective evidence—as opposed to the employee's "mere personal beliefs, conjecture and speculation"—that other similarly situated co-workers were disciplined less harshly than she was. *See Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006).

Here, for the reasons explained by the district court, the record is devoid of evidence that the Jail disciplined Million more harshly than it did other similarly situated employees. Her assertions to the contrary amount only to her own conjecture and speculation. The district court was correct to grant summary judgment as to this claim.

## VI.  Conclusion

For the reasons given above, we affirm the district court's dismissal of Million's sex-discrimination and retaliation claims.

WHITE, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's resolution of Million's sex-discrimination claim. However, because Million adequately established an "adverse action," I dissent from the affirmance of the dismissal of her retaliation claim.

Million brings her retaliation claim under Ohio Revised Code § 4112.02(I). This provision mirrors the language of Title VII's retaliation provision, and "federal law provides the applicable analysis for reviewing retaliation claims" under § 4112.02(I). *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (quoting *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998)). A plaintiff may prove retaliation through direct or circumstantial evidence, and when she presents only circumstantial evidence—as Million does here—the "*McDonnell Douglas*" burden-shifting framework applies.[1] *Yazidian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644-45 (6th Cir. 2015); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

Under that framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation by showing that (1) she engaged in protected activity; (2) the defendant knew of this protected activity; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) there is a causal connection between the protected activity and adverse action. *Laster*, 746 F.3d at 730; *Braun*, 828 F.3d at 510. The "burden of establishing a *prima facie*" retaliation case is "not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If the plaintiff makes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Imwalle*, 515 F.3d at 544. The

_____

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

burden then shifts back to the plaintiff to show that this reason was a "pretext designed to mask retaliation." *Id.*

All agree that Million engaged in protected activity and that Warren County knew about that activity. But the district court concluded—and the majority agrees—that Million failed to show that she suffered a materially adverse action.

To establish an adverse action in the retaliation context, a plaintiff must show that "'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laster*, 746 F.3d at 732 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). It is "less onerous" to prove this element in the "retaliation context than in the anti-discrimination context." *Id.* at 731 (citation and internal quotation marks omitted).

Million argues that Warren County subjected her to adverse action in three ways: (1) issuing a written reprimand for her March 20, 2014 absence—rather than a verbal reprimand or counseling—which led to a February 2015 suspension and loss of Million's FTO status; (2) selectively punishing her, on April 16, 2014, for failing to complete a "round" in 59 minutes and for using the internet for personal reasons; and (3) subjecting Million to an unwarranted sick-leave review and disciplinary hearing over a justified absence from work.

These allegations are similar to those in *Laster*. 746 F.3d at 732. There, the court held that the plaintiff—a police officer bringing Title VII race-discrimination and retaliation claims—satisfied the "materially adverse action" element by showing that he (1) faced "heightened scrutiny," (2) received "frequent reprimands for breaking selectively enforced policies," (3) was disciplined "more harshly than similarly situated peers," and (4) was "forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing." *See id.* at 732 (holding

that these circumstances "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."). Million has shown the same.

Like Laster, Million was "forced to attend a pre-determination hearing based on unfounded allegations." The Jail admitted that its December 29, 2014 hearing over Million's November 22 sick-leave—when her supervisor sent her home—was unfounded. *See* R. 34 PID 629 (concluding that this sick-leave review "should not have been done").[2] A jury could also find that the Jail subjected Million to "heightened scrutiny" by issuing her a formal reprimand for the minor offense of completing a rover "round" one minute late. And it could conclude that the Jail disciplined her "more harshly than similarly situated peers" by giving her a written reprimand for personal internet use while ignoring coworkers who did the same.

There is also a dispute of fact regarding whether the Jail selectively over-disciplined Million when issuing her a written reprimand on March 24, 2014. Million testified that the Jail's normal practice is to issue a verbal reprimand or counseling for an employee's first active absence violation. The Jail's Disciplinary Policy provides that "[t]ypically, counseling is the first form of corrective action" for a "minor behavior or performance issue," and defines "minor offense" to include a "first or second violation[] of [absence rules]." R. 32-5 PID 201, 203. The March 20 absence was Million's first active violation. And on November 8, 2011,[3] prior to Million's EEOC

---

[2] Addressing Million's sick-leave allegations, the district court reasoned that the "record is devoid of any evidence establishing that other employees, who likewise took leave in similar circumstances, were not also subjected to an administrative investigation." R. 43 PID 906. But the Jail's Leave Policy does just that. It provides that employees sent home by supervisors (i.e., those who take "leave in similar circumstances") may not be subjected to sick-leave reviews. Reading the facts favorably to Million, we must assume that the Jail follows its own policies, and thus does not subject employees sent home by supervisors to investigations and disciplinary hearings.

[3] This earlier violation would have fallen off Million's record by March 2014. *See* R. 34 PID 591 (collective bargaining agreement providing that verbal and written reprimands "cease to have force and effect one (1) year from the date of issuance").

complaint, she received a verbal reprimand—not a written one—for failing to report for an overtime shift.[4]

Considered together, these events—like those in *Laster*—could lead a jury to conclude that Million suffered adverse employment action. The district court's conclusion to the contrary fails to read the record in Million's favor in at least three ways. First, the court dismissed the March 24, 2014 written reprimand and November-December 2014 hearings, stating that Million offered no proof (aside from her own "bare assertions") that the Jail normally behaved in a different manner than it did for Million. R. 43 PID 905. But this fails to address any of the evidence discussed above, including the provisions of the Jail's policies that support Millions' view of both events. Second, the district court never mentioned the formal reprimand for Million's minor offense of completing a rover round one minute late.

Third, the district court declined to consider the internet-usage reprimand because Million did not prove that her coworkers used the internet in the same extensive or extended way that she did. But aside from a vague and conclusory statement from the Jail, nothing in the record shows that Million's use was "extensive" or "extended."[5] The only specifics from the record show that when she asked about this violation, Million was told that she visited a camping website. A jury could find that this activity was similar to the activities of her coworkers that went unpunished (e.g., watching basketball highlights). The district court also failed to address the timing of the internet reprimand, which was served on Million shortly after the rover-round reprimand. Context

---

[4] To be sure, a jury could credit the Jail's description of this incident and find that Million's offense was "serious" because it involved alcohol. But it could also accept Million's version and view the incident as a minor scheduling mishap for which Million was not solely to blame, given that her supervisors set the calendar to show that both halves of her shift were covered.

[5] The Jail's full explanation as to the extent of Million's internet usage went as follows: "During a recent audit, it was discovered that you have been using the internet for personal gain. Your use has been excessive and covers an extended period of time." R. 34 PID 636.

matters when assessing the adverse-action element, and together, these two reprimands could have created a reasonable impression that Million was being unduly scrutinized due to her discrimination complaints.[6]

In sum, I would find that Million produced sufficient evidence of an adverse employment action, reverse the dismissal of her retaliation claim, and remand for further proceedings.

---

[6] *See Burlington*, 548 U.S. at 69 ("We phrase the [adverse-action] standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" (citation omitted)).

We have recognized that the adverse-action element can be satisfied when the employer "place[s] [the employee] under close surveillance." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 570 (6th Cir. 2019). The back-to-back issuance of the rover reprimand and internet-usage writeup—the latter imposing a higher level of discipline based on the "intervening discipline" created by the former an hour earlier—could surely create an impression that Million was being placed under close surveillance due to her gender-discrimination complaints. It could also create the reasonable impression that Million was being scrutinized "more closely" than her coworkers, another actionable "adverse action." *Id.* at 564, 570 (citation omitted). The district court failed to read the record favorably to Million by isolating the internet-usage reprimand from the "constellation of surrounding circumstances" that informed how that reprimand would be perceived. A jury at trial can take that view of the evidence, but we may not do so at this stage.